UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:16-CV-81238-ROSENBERG/BRANNON

JOHN WALTER,

    Plaintiff,

v.

JET AVIATION FLIGHT SERVICES, INC.
and MATTHEW RAVER,

    Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendants' Motion for Final Summary Judgment [DE 64]. The Court has carefully considered Defendants' Motion, and the parties' respective filings in opposition thereto and in support thereof, and is otherwise fully advised in the premises. For the reasons set forth below, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

### I. INTRODUCTION

This is an action for defamation and tortious interference with business relationships. Plaintiff John Walter ("Walter"), a pilot, asserts that Defendant Matthew Raver ("Raver"), his former co-pilot, made defamatory statements about Walter's flying to their employer, Defendant Jet Aviation Flight Services, Inc. ("Jet Aviation"). Walter further asserts that Jet Aviation, in turn, made defamatory statements about Walter's flying to Bruce and Suzanne Kovner ("the Kovners"), the owners of a private plane regularly flown by Walter. As a result of these defamatory statements, Walter asserts, Jet Aviation terminated Walter's employment and the Kovners decided that Walter should cease flying their plane.

In the Motion presently before the Court, Raver and Jet Aviation seek summary judgment as to all four claims asserted against them. With respect to Walter's claims that Raver made defamatory statements to Jet Aviation (Count I), and that Jet Aviation made defamatory statements to the Kovners (Count III), summary judgment is denied because the Court cannot determine as a matter of law whether either Raver or Jet Aviation was motivated *primarily* by malice, and such a finding is necessary to overcome the qualified privilege to which both Raver's and Jet Aviation's statements are entitled. With respect to Walter's claims that Raver tortiously interfered with the business relationship between Walter and Jet Aviation (Count II), and that Jet Aviation tortiously interfered with the business relationship between Walter and the Kovners (Count IV), summary judgment is granted because neither Raver nor Jet Aviation was motivated *solely* by malice, and Walter has therefore failed to overcome the privilege to which both Raver's and Jet Aviation's interferences are entitled.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247–48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247–48).

In deciding a summary judgment motion, the Court views the facts in the light most

favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

### III.  FACTS[1]

Walter and Raver are both pilots who, while employed by aircraft management company Gama Aviation, began flying the Kovners' private plane on a regular basis. DE 63-1, Walter Deposition at 50:25–51:2, 52:11–19. When the Kovners moved the management of their plane from Gama Aviation to Jet Aviation, they asked Walter and Raver to follow and continue flying their plane. *Id.* at 51:13–24, 53:4–15. Walter and Raver agreed and, in April of 2015, began their employment with Jet Aviation, where they continued to fly the Kovners' plane on a regular basis. *Id.* at 60:12–61:11, 61:25–62:3, 64:18–21.

During his employment with Jet Aviation, Walter reported directly to Nicholas Guiffre ("Guiffre"), Jet Aviation's chief pilot. *Id.* at 61:12–23, 186:14–15. Walter's employment with Jet Aviation was at will; as such, it could be terminated with or without cause and with or without notice at any time by either party. *Id.* at 68:16–69:11.

In November of 2015, Walter and several Jet Aviation employees—including Guiffre, Raver, Jet Aviation's director of operations, and Jet Aviation's director of safety—participated in a conference call to discuss concerns about Walter's flying after Raver reported to Jet Aviation that Walter had engaged in certain improper flying practices. *Id.* at 185:3–189:23; *see also* DE 63-3 (emails dated April 18, 2016 and April 28, 2016 in which Walter acknowledges that this conversation took place, that they discussed Raver's reported concerns about Walter's flying, and that Walter agreed to adhere to certain flying practices). In April of 2016, Raver again

---
[1] The facts set forth in this section are undisputed unless otherwise indicated.

3

reported in an email to Guiffre that Walter had engaged in certain improper flying practices, including those previously reported in 2015, on numerous occasions. DE 82-5, Guiffre Deposition at 28:10–32:1; DE 82-11 (Raver's email to Guiffre).

These concerns were then conveyed to the Kovners.[2] During a telephone call with Jet Aviation employees, Bruce Kovner and his employee, Karen Cross ("Cross"), were informed that Walter was using "irregular procedures" while flying the Kovners' plane, which "were not within the acceptable parameters of best practices." DE 82-3, Bruce Kovner Deposition at 13:20–15:7; *see also* DE 63-5 (excerpts from deposition of Jet Aviation employee Christine Amos and copy of Amos's handwritten notes taken during April 19, 2016 telephone call between Jet Aviation management, Bruce Kovner, and Cross, showing that concerns about Walter's flying were discussed). Bruce Kovner felt that Jet Aviation was telling him that Walter was flying the plane in an unsafe manner. DE 82-3, Bruce Kovner Deposition at 16:24–17:2. For that reason, Bruce Kovner told Jet Aviation that he expected a thorough investigation. *Id.* at 24:1–8, 25:1–5.

Guiffre investigated Raver's reported concerns by speaking to Jet Aviation employees—including Raver, Walter, and Jet Aviation's director of operations—and reviewing emails, the Airman's Information Manual, and approach charts for the airports into which Walter and Raver had flown. DE 82-5, Guiffre Deposition at 10:24–11:2, 11:20–12:19. Jet Aviation subsequently reported back to Cross, following which Bruce Kovner decided—and informed Jet Aviation—that Walter should no longer fly the Kovners' plane. DE 82-3, Bruce Kovner Deposition at 25:6–26:22.

Jet Aviation terminated Walter's employment on April 29, 2016. DE 63-1, Walter

---

[2] Raver and Jet Aviation assert that Walter has presented no evidence that Jet Aviation conveyed these concerns to the Kovners. With respect to this issue, the Court views the facts in the light most favorable to Walter and draws all reasonable inferences in his favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

Deposition at 99:16–18. While Guiffre did not make the final decision to terminate Walter's employment, Guiffre told Walter that his employment was being terminated for flying too low and "for a continued pattern of noncompliance, or something like that." *Id.* at 99:19–100:14; DE 97-1, Guiffre Deposition at 13:23–14:6.

Walter has since found other employment. His current employer heard nothing about these concerns with Walter's flying prior to hiring him; Walter's hiring and compensation were in no way affected by the circumstances surrounding his separation from Jet Aviation. DE 63-7, Peter Cipriano Deposition at 16:2–24, 23:11–16. No prospective employer told Walter that he would not be hired because of any concerns reported by Raver and Jet Aviation, and at least one employer hired Walter despite hearing of such concerns. DE 63-1, Walter Deposition at 296:9–297:1, 324:14–22. However, Walter testified that as a result of losing his employment with Jet Aviation and his role as the Kovners' regular pilot—precipitated by Raver's and Jet Aviation's reported concerns—Walter has suffered a pay cut, the expense and inconvenience of commuting to Connecticut, and emotional distress. *Id.* at 301:1–6, 305:25–306:12, 320:25–321:10.

The parties dispute the motivation behind Raver's decision to report concerns about Walter's flying to Jet Aviation. Viewing the facts in the light most favorable to Walter and drawing all reasonable inferences in his favor, the Court finds that Raver's decision to do so was motivated by a combination of malice and a genuine but misguided belief that Walter was engaging in unsafe flying practices.

As evidence of Raver's malice, Walter testified to specific instances of Raver's "predilections to malice, bullying and mischief," including Raver's "ominous" statements that Walter "better be glad [Raver] doesn't want [Walter's] job," that Raver had gotten two other pilots fired, that Raver had an uncle who was part of the Mafia, and that Raver had an unstable

5

fraternity brother who fired shots at the cast and crew of a reality television show and threatened people who interfered with Raver. *Id.* at 259:23–261:19.[3] Walter felt threatened by these statements. *Id.* at 261:5–7. Walter further testified that Raver was "very angry" and "had many issues with Jet Aviation." *Id.* at 257:11–16, 262:2–4, 263:19–264:23, 266:20–267:19. In an email to Jet Aviation addressing Raver's reported concerns about Walter's flying, Walter wrote that he was "concerned that [Raver's] anger may be clouding his perception of our flight operations." *See* DE 63-3 at 3; *see also* DE 63-1, Walter Deposition at 360:22–361:23.

As evidence of Raver's genuine but misguided belief that Walter was engaging in unsafe flying practices, Walter testified that Raver was ignorant of proper flying procedures and that this ignorance contributed to Raver's decision to report concerns about Walter's flying to Jet Aviation. For example, Walter testified that "Raver caused much of this with his ignorance," referring to when Raver reported concerns about Walter's flying to Jet Aviation. *Id.* at 85:24–86:8; *see also id.* at 87:15–89:3, 109:9–22, 337:3–11, 368:13–19, 369:19–370:7 (discussing Raver's ignorance); DE 63-3 at 5 (email from Walter to Cross in which Walter writes that he hoped to "educate" Raver on proper flying procedures and that he believed Raver was "confusing" certain issues and "emotionally reacting"); *id.* at 2–3 (email from Walter to Jet Aviation management in which Walter writes of Raver's reported concerns, "I'm not quite sure how this is a problem other than [Raver's] perception.").

Despite Walter's belief that Raver's concerns were unfounded, Walter invited Raver to raise his concerns with Jet Aviation management if Walter and Raver could not agree on proper flying procedures. *See id.* at 5. When asked about having invited Raver to contact someone higher up at Jet Aviation to discuss his concerns, Walter testified, "I wouldn't stand in

---

[3] Raver disputes having made any of these statements. *See* DE 92-3, Raver Deposition at 9:11–17, 69:1–6, 70:18–71:17, 71:24–72:17.

someone's way of voicing their opinion about a safety concern." DE 63-1, Walter Deposition at 199:13–17. Walter further testified that pilots have a duty "to ensure the proper outcome of a safe flight," meaning a safe landing. *Id.* at 22:23–23:5. If one pilot feels that another pilot is flying unsafely, he has an obligation to report that to the employer. *Id.* at 38:6–17.

The parties also dispute the motivation behind Jet Aviation's decision to report concerns about Walter's flying to the Kovners. Viewing the facts in the light most favorable to Walter and drawing all reasonable inferences in his favor, the Court finds that Jet Aviation's decision to do so was motivated by a combination of malice and a genuine but misguided belief that Walter was engaging in unsafe flying practices.

As evidence of Jet Aviation's malice, Walter testified—based on conversations with other pilots[4] and his own knowledge of the industry—that Jet Aviation wanted to terminate his employment in order to replace him with a pilot of its own choosing and was looking for an excuse to do so. *Id.* at 106:14–108:16, 251:24–253:25. Walter further testified that a vice president at Jet Aviation emailed Cross offering "to vet [the Kovners'] pilots while we're checking for a new maintenance person," suggesting that Jet Aviation wanted to replace the Kovners' pilots, Walter and Raver, with pilots of its own choosing. *Id.* at 249:3–250:16.

As evidence of Jet Aviation's genuine but misguided belief that Walter was engaging in unsafe flying practices, Walter testified that Jet Aviation management did not understand proper flying procedures, and that his own understanding of proper flying procedures was greater than Jet Aviation's. *Id.* at 362:25–363:8.

---

[4] To the extent Walter's testimony relies on the statements of other pilots, Jet Aviation challenges this testimony as inadmissible hearsay evidence, which cannot be considered on a motion for summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). However, even if the Court does not consider the statements of other pilots, Walter has presented sufficient evidence for this Court to find that Jet Aviation wanted to replace Walter and Raver with other pilots and was looking for an excuse to do so. Again, for purposes of this Motion, the Court views the facts in the light most favorable to Walter and draws all reasonable inferences in his favor.

7

# IV. DISCUSSION

The Court first addresses Raver's and Jet Aviation's request for summary judgment as to Walter's defamation claims, then turns to their request for summary judgment as to Walter's claims for tortious interference with business relationships.

## A. Defamation Claim Against Raver (Count I) and Defamation Claim Against Jet Aviation (Count III)

Jet Aviation argues that Walter has failed to present any evidence that Jet Aviation made any defamatory statements. In addition, both Raver and Jet Aviation argue that any defamatory statements they made were privileged. Raver and Jet Aviation also argue that Walter has failed to present any evidence of damages caused by their defamatory statements.

The Court concludes that Walter has in fact presented evidence that both Raver and Jet Aviation made defamatory statements. No absolute privilege applies in this case, and any qualified privilege to which Raver's and Jet Aviation's statements are entitled may be overcome by evidence of express malice—that is, evidence that the primary motive for the statements was an intention to injure Walter. The Court cannot determine what either Raver's or Jet Aviation's primary motive was. The Court also finds that Walter has presented evidence of damages caused by Raver's and Jet Aviation's defamatory statements. Summary judgment must therefore be denied as to Walter's defamation claims.

### 1. Applicable Legal Principles

As an initial matter, the parties dispute whether Walter's Complaint asserts claims for defamation or claims for defamation *per se*. *See* DE 93 at 3. A claim for defamation *per se* may proceed under a theory of slander *per se* where the statement at issue imputes "conduct, characteristics, or a condition incompatible with the proper exercise of [the plaintiff's] lawful business, trade, profession, or office." *See Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240,

1247 (S.D. Fla. 2014) (quoting *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 497 (Fla. 1953)). While neither Count I nor Count III of Walter's Complaint uses the phrase "defamation *per se*," each alleges that the statements at issue were "incompatible with Walter's trade or profession." *See* DE 1, Complaint ¶¶ 51, 65. Accordingly, the Court concludes that Walter has alleged defamation *per se* against both Raver and Jet Aviation. The Court therefore proceeds under the legal framework applicable to claims for defamation *per se*.

"As a general rule, there is a presumption of malice where statements are defamatory *per se*, but that presumption ceases to exist where the Defendant has a qualified privilege to make the statements." *Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539, 1542 (M.D. Fla. 1993) (citing *Axelrod v. Califano*, 357 So. 2d 1048 (Fla. Dist. Ct. App. 1978)). In other words, "[t]he determination that a defendant's statements are qualifiedly privileged eliminates the presumption of malice attaching to defamatory statements by law. The privilege instead raises a presumption of good faith and places upon the plaintiff the burden of proving express malice." *Nodar v. Galbreath*, 462 So. 2d 803, 810 (Fla. 1984).

"[C]ommunication between a corporation and employees identified as witnesses or those with an interest in the disciplinary practices of their employer and the safety and security of their workplace are privileged." *See Colbert v. Anheuser-Busch, Inc.*, No. 3:11-CV-243-J25-JBT, 2013 WL 12145017, at *3 (M.D. Fla. Mar. 5, 2013) (citing *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 834 (Fla. Dist. Ct. App. 2007)). While *Colbert* does not explicitly state as much, a review of *American Airlines* and cases cited therein establishes that this is a qualified—not absolute—privilege. *See, e.g.*, *Am. Airlines*, 960 So. 2d at 834 (citing *Nodar*, 462 So. 2d at 809) (referring to statements that are "conditionally privileged"); *see also Nodar*, 462 So. 2d at 810 ("Under the common law of Florida, a communication to an employer regarding his employee's

9

performance is conditionally privileged, and the mode, manner, or purpose of the communication would go to the question of abuse or forfeiture of the privilege.").[5] Similarly, Florida law recognizes a qualified privilege for "communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty . . . if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable . . . ." *Nodar*, 462 So. 2d at 809.[6]

A qualified privilege may be overcome by evidence of express malice. "Express malice under the common law of Florida, necessary to overcome the common-law qualified privilege, is present where the *primary* motive for the statement is shown to have been an intention to injure the plaintiff." *Id.* at 806 (emphasis added). "Express malice has been defined as 'ill will, hostility, evil intention to defame and injure,' and is a very high standard for a plaintiff to meet." *Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539, 1542 (M.D. Fla. 1993) (quoting *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211 (1887)).

> Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege is destroyed. Strong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position to gratify his malevolence. If the occasion of the communication is privileged because of a proper interest to be protected, and the defamer is motivated by a desire to protect that interest, he does not forfeit the privilege merely because he also in fact feels hostility or ill will toward the

---

[5] Raver relies on *Colbert* to assert an absolute privilege for his statements to Jet Aviation. However, *Colbert* establishes only that "[s]tatements related to and within the scope of the grievance process are protected by absolute privilege." *Colbert*, 2013 WL 12145017, at *3 (citing *Hope v. Nat'l All. of Postal & Fed. Employees, Jacksonville Local No. 320*, 649 So. 2d 897, 900 (Fla. Dist. Ct. App. 1995)). *Hope* involved statements made during a formal grievance procedure between a labor organization and an employer. That is not the case here.

[6] Despite the assertions of Raver and Jet Aviation, the Court is not convinced that the statements of either party are entitled to a separate qualified privilege for statements concerning aviation safety. The only two cases cited by Raver and Jet Aviation do not establish any privilege that applies to this case. *See Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014) (involving the application of 49 U.S.C. § 44941(a)); *Rivera v. Nat'l R.R. Passenger Corp.*, No. C 99-04003 SI, 2004 WL 603587, at *6 (N.D. Cal. Mar. 22, 2004) (involving the application of Cal. Civ. Code § 47). As the Court concludes that both Raver's and Jet Aviation's statements are qualifiedly privileged on other grounds, the Court need not reach any conclusion as to the existence or applicability of a qualified privilege for statements concerning aviation safety.

plaintiff. The incidental gratification of personal feelings of indignation is not sufficient to defeat the privilege where the *primary* motivation is within the scope of the privilege.

*Nodar*, 462 So. 2d at 811–12 (internal quotation marks and citations omitted) (emphasis added).

### 2. The Instant Case

The Court begins with Jet Aviation's contention that Walter has presented no evidence that Jet Aviation made any defamatory statements. Jet Aviation argues that the only allegation of defamation by Jet Aviation in Walter's Complaint is that Jet Aviation told Cross "some things" about Walter. *See* DE 1, Complaint ¶ 47. Jet Aviation further argues that Walter conceded during the December 5, 2016 hearing on Defendants' Motion to Dismiss the Complaint [DE 17] that this allegation was the sole basis for Walter's defamation claim against Jet Aviation. Finally, Jet Aviation argues that Walter failed to depose Cross during discovery and, therefore, cannot present any evidence of what Jet Aviation said to her.

The Court notes that, in addition to alleging that Jet Aviation told Cross "some things" about Walter, Walter's Complaint alleges that Jet Aviation made "statements about Walter to Kovner and his employees." *See* DE 1, Complaint ¶ 64. In addition, having reviewed the transcript of the December 5, 2016 hearing, the Court is not convinced that Walter did in fact concede that that the sole basis for his defamation claim against Jet Aviation was the allegation that Jet Aviation told Cross "some things" about Walter. *See* DE 63-2. Regardless, as discovery had not yet been conducted, it is entirely possible that Walter was aware of no other basis for his defamation claim against Jet Aviation at the time of that hearing. That does not preclude Walter from advancing evidence of defamation by Jet Aviation about which Walter subsequently learned during discovery.

The Court does not agree that Walter has failed to present evidence of *any* defamatory

statements made by Jet Aviation. As set forth above, Walter has presented the deposition testimony of Bruce Kovner, which indicates that Jet Aviation raised concerns about Walter's flying to him and Cross. In addition, while Amos's deposition testimony and handwritten notes do not establish conclusively who said what during an April 19, 2016 telephone call, they do at least support the reasonable inference that Jet Aviation raised concerns about Walter's flying to Bruce Kovner and Cross.

However, both Raver's and Jet Aviation's statements about their concerns with Walter's flying are entitled to a qualified privilege. As Walter's co-pilot and fellow Jet Aviation employee, Raver unquestionably had an interest in the safety and security of the workplace and in Walter's employment performance. His statements to Jet Aviation about these matters are therefore qualifiedly privileged. *See Colbert v. Anheuser-Busch, Inc.*, No. 3:11-CV-243-J25-JBT, 2013 WL 12145017, at *3 (M.D. Fla. Mar. 5, 2013) (citing *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 834 (Fla. Dist. Ct. App. 2007)); *Nodar*, 462 So. 2d at 810. Likewise, as the company managing the Kovners' private plane and employing the pilots who flew that plane, Jet Aviation unquestionably had an interest in the safety of Walter's flying, a matter in which the Kovners had a corresponding interest. Its statements to the Kovners about Walter's flying are therefore qualifiedly privileged as well. *See Nodar*, 462 So. 2d at 809.

While Raver's and Jet Aviation's statements are entitled to a qualified privilege, neither party is entitled to summary judgment if there is evidence of express malice—that is, evidence that the primary motive for the statements was an intention to injure Walter. As set forth above, the Court has determined for purposes of the Motion presently before it that both Raver and Jet Aviation were motivated by a combination of malice and a genuine but misguided belief that Walter was engaging in unsafe flying practices. The Court cannot determine, however, whether

12

either Raver's or Jet Aviation's *primary* motive in reporting concerns about Walter's flying was an intention to injure Walter. This is a question for the jury.

Finally, the Court rejects Raver's and Jet Aviation's contention that Walter has failed to present any evidence of damages caused by their defamatory statements. As set forth above, Walter has presented evidence that he suffered a pay cut, the expense and inconvenience of commuting to Connecticut, and emotional distress as a direct result of Raver's and Jet Aviation's statements. Accordingly, summary judgment must be denied as to Walter's defamation claims.

**B. Tortious Interference Claim Against Raver (Count II) and Tortious Interference Claim Against Jet Aviation (Count IV)**

Jet Aviation argues that Walter had no business relationship with the Kovners with which to interfere. In addition, both Raver and Jet Aviation argue that, as parties to the business relationships with which they interfered, they cannot be held liable for tortious interference. Both parties also argue that Walter has failed to present any evidence of damages caused by their interference.

The Court need not decide whether Walter did in fact have a business relationship with the Kovners. Even assuming that he did, the Court concludes that Jet Aviation was privileged to interfere with that relationship, just as Raver was privileged to interfere with the business relationship between Walter and Jet Aviation. As malice was neither Raver's nor Jet Aviation's sole motive, Walter cannot overcome this privilege, and summary judgment must be granted as to Walter's tortious interference claims. Having reached that conclusion, the Court need not determine whether Walter has presented evidence of damages caused by their interference, and therefore declines to do so.

**1. Applicable Legal Principles**

To succeed on a claim for tortious interference with a business relationship under Florida

law, Walter must establish: "(1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).

With respect to the third of these four elements, "an interference is unjustified where the interfering defendant is a stranger to the business relationship." *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014) (internal quotation marks and citations omitted). Thus, "a claim for tortious interference . . . cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party. In other words, the interfering defendant must be a third party, a stranger to the business relationship." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001) (internal quotation marks and citations omitted).

"An interfering defendant is not a stranger . . . if the defendant has any beneficial or economic interest in, or control over, that relationship. This includes when a defendant has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Hamilton*, 6 F. Supp. 3d at 1320 (internal quotation marks and citations omitted). "Similarly, an agent of a corporate party to the business relationship cannot be held liable for tortious interference if he was acting within his capacity and scope as an agent of the corporation." *SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1199 (S.D. Fla. 2013) (citing *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1367 (M.D. Fla. 2007)). "[A]n employee or representative of a contracting party must be considered as a

party to the [contractual] relationship. Given that corporate entities . . . must act through individuals, a tortious interference claim will generally not lie against employees and representatives of contracting entities." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. Dist. Ct. App. 1999) (internal quotation marks and citation omitted).

There is, however, an exception to the general principles set forth above. Interference by one who is not a stranger to a business relationship may nevertheless be unjustified where "malice is the *sole* basis for the interference. In other words, the party must be interfering *solely* out of spite, to do harm, or for some other bad motive." *Ernie Haire*, 260 F.3d at 1294 n.9 (emphasis in original). "While non-strangers generally have a 'privilege to interfere' with the business relationship to protect their own economic interests, they may still be liable for tortious interference if they do so in bad faith." *Hamilton*, 6 F. Supp. 3d at 1320 (internal citation omitted). In other words, "[t]his privilege is not absolute; it is destroyed where an employee acts *solely* with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest." *Dukenel v. Kindred Hosp. E., LLC*, No. 09-61184-CIV, 2010 WL 1850238, at *1 (S.D. Fla. May 7, 2010) (internal quotation marks and citation omitted) (emphasis added); *see also Reyes v. Foreclosure Asset Sales & Transfer P'ship*, No. 13-22829-CIV, 2014 WL 12623071, at *9 (S.D. Fla. Mar. 5, 2014); *Palm Beach Cty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1095 (Fla. Dist. Ct. App. 2009).

### 2. The Instant Case

With respect to Walter's tortious interference claim against Raver, the relevant business relationship is that between Walter and Jet Aviation. As Walter's co-pilot and fellow Jet Aviation employee, Raver was not a stranger to that relationship. *See Hamilton*, 6 F. Supp. 3d at

15

1320; *SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1199 (S.D. Fla. 2013); *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1099 (Fla. Dist. Ct. App. 1999). And, as set forth above, the Court has determined for purposes of the Motion presently before it that Raver was motivated by a combination of malice and a genuine but misguided belief that Walter was engaging in unsafe flying practices. In other words, malice was not Raver's *sole* motive. Accordingly, Walter cannot overcome Raver's privilege to interfere, and summary judgment must be granted as to Walter's tortious interference claim against Raver.

With respect to Walter's tortious interference claim against Jet Aviation, the relevant business relationship is that between Walter and the Kovners. While Jet Aviation disputes that any such relationship existed, the Court need not decide that issue. Assuming that such a relationship did exist, Jet Aviation—as the company managing the Kovners' plane and employing Walter to fly it—was no stranger to that relationship. Without question, Jet Aviation had an economic interest in and at least some control over any relationship between Walter and the Kovners. *See Hamilton*, 6 F. Supp. 3d at 1320. As set forth above, the Court has determined for purposes of the Motion presently before it that Jet Aviation was motivated by a combination of malice and a genuine but misguided belief that Walter was engaging in unsafe flying practices. In other words, malice was not Jet Aviation's *sole* motive. Accordingly, Walter cannot overcome Jet Aviation's privilege to interfere, and summary judgment must be granted as to Walter's tortious interference claim against Jet Aviation.

V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Final Summary Judgment [DE 64] is **GRANTED IN PART and DENIED IN PART** as follows: Summary judgment is **GRANTED** in favor of Raver as to Count II (Tortious

Interference Claim Against Raver) and in favor of Jet Aviation as to Count IV (Tortious Interference Claim Against Jet Aviation). As to Count I (Defamation Claim Against Raver) and Count III (Defamation Claim Against Jet Aviation), summary judgment is **DENIED**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this <u>31st</u> day of July, 2017.

Copies furnished to:
Counsel of Record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE